**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

EMILY L.,

        *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

        *Defendant.*

_____/

Case No. 2:25-cv-10773

Robert J. White
United States District Judge

Patricia T. Morris
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 19)**

**I.     RECOMMENDATION**

For the reasons set forth below, it is recommended Plaintiff Emily L.'s motion for summary judgment be **DENIED** (ECF No. 12), Defendant Commissioner of Social Security's motion for summary judgment be **GRANTED** (ECF No. 19), and the final decision of the Administrative Law Judge (ALJ) be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

On May 20, 2021, Plaintiff filed an application for Supplemental Security Income, alleging she became disabled on December 20, 2019.  (ECF No. 7-1, PageID.47).  The Commissioner initially denied the application on April 4, 2022,

1

and on reconsideration on April 25, 2023. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on November 8, 2023. (*Id.* at PageID.78–126). The ALJ issued a written decision on February 20, 2024, finding Plaintiff was not disabled. (*Id.* at PageID.44–70). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on January 24, 2025. (*Id.* at PageID.34–36).

Following the denial of review, Plaintiff sought judicial review on March 19, 2025. (ECF No. 1). The parties have since filed cross-motions for summary judgment. (ECF Nos. 12, 19).

### B.     Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to

2

support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.     Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ]

will find that [the claimant is] not disabled.

(ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide

4

evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 7-1, PageID.70). At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity since December 20, 2019, the alleged onset date. (*Id.* at PageID.49). At Step Two, the ALJ found the following impairments severe: ankylosing spondylitis; degenerative disc disease of lumbar spine; Addison's disease; hypothyroid; migraine; fibromyalgia; dysfunction of right knee with patellar instability, status post-surgery with residuals; obesity; chronic pain syndrome; vasovagal syncope; depressive, bipolar and related disorders;

5

anxiety disorder; posttraumatic stress disorder (PTSD); and borderline personality disorder.  (*Id.* at PageID.50).

At Step Three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.50–53).  Next, the ALJ found Plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally climb ramps and stairs; never climb ladders or scaffolds; occasionally stoop, kneel, crouch and crawl; and can occasionally perform overhead reaching.  The claimant must avoid concentrated exposure to extreme heat, extreme cold, and vibration. There should be no exposure to workplace hazards such as unprotected heights and hazardous machinery.  The work must allow for the exercise of a sit/stand option, which I define as follows: first there must be work that can be done in either position, such that the change in position does not cause the worker to go off task.  After standing 30 minutes, the worker should have the option to sit for up to 30 minutes. After sitting 30 minutes, the worker should have the option to stand for up to 30 minutes.  The work should be limited to simple work, involving understanding, remembering and carrying out simple instructions, and not involving complex instructions.  The work must be free of fast-paced production requirements, such as assembly line work, or work that requires hourly production quotas.  There should be no more than occasional interaction with supervisors and coworkers, with no tandem tasks.

(*Id.* at PageID.53–54).

At Step Four, the ALJ found Plaintiff was unable to perform any past relevant work.  (*Id.* at PageID.68).  However, at Step Five, the ALJ found other jobs in the national economy Plaintiff could perform.  (*Id.* at PageID.69).  Specifically, the ALJ found Plaintiff could perform the requirements of a document preparer (30,100 jobs

in the national economy), a printer circuit board inspector (19,800), and an information clerk (15,200). (*Id.*). The ALJ thus concluded Plaintiff was "not disabled." (*Id.* at PageID.70).

### E. Administrative Record

Plaintiff raises two issues on appeal. First, she argues the ALJ erred by creating an internally inconsistent RFC with the imposed sit/stand option. Second, she argues the ALJ erred by evaluating her subjective testimony using an improper legal standard. While the Court has reviewed the entire record, only a short summary of the medical evidence is necessary as Plaintiff only raises legal issues.

Plaintiff, among other things, has been diagnosed with unspecified memory loss, depression, PTSD, chronic pain,[1] chronic sleep disruption, secondary adrenal insufficiency, hyperprolactinemia, and pituitary adenoma, generalized anxiety disorder, bipolar disorder, major depressive disorder, and borderline personality disorder. (ECF No. 7-1, PageID.361, 918, 1124).

In July 2020, Plaintiff had a right open knee patellofemoral ligament repair/reconstruction, which went well.[2] (*Id.* at PageID.796, 801, 804). After presenting to a healthcare provider with back and neck pain, Plaintiff was also

---

[1] An accident when she was 15 led to chronic back pain. (ECF No. 7-1, PageID.1158).

[2] However, records show Plaintiff has had multiple knee surgeries and, after a period of being pain-free in her knee, continues to have chronic knee pain making walking, using stairs, and getting up to stand difficult. (ECF No. 7-1, PageID.808, 822, 1100–01).

diagnosed with cervicalgia, spondylosis of the cervical region without myelopathy or radiculopathy, low back pain, ankylosing spondylitis, pain in right hip, and obesity. (*Id.* at PageID.386). She has consistently presented to her healthcare providers with pain symptoms. (*E.g.*, *id.* at PageID.824, 826, 996, 1150). A blood test in 2021 showed a high 29.5 result for rheumatoid factor. (*Id.* at PageID.830).

At a March 2022 physical consultative exam, Plaintiff reported being able to drive, do activities of daily living and chores except for grocery shopping, and that she used to enjoy four-wheeling and horseback riding but now mostly reads, crochets, and plays outside with her children. (*Id.* at PageID.846). It was reported she could sit for half an hour, stand for ten minutes, walk half a mile, and lift thirty pounds occasionally. (*Id.*). A musculoskeletal physical examination showed

> no evidence of joint laxity, crepitance, or effusion. Grip strength remains intact. Dexterity is unimpaired. The patient could button clothing and open a door. The patient had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting, and no difficulty standing 3 seconds on either foot. There is tenderness at the cervical and lumbar spine.

(*Id.* at PageID.847). Her motor strength was noted as intact, muscle tone normal, and she walked with a normal gait without an assistive device. (*Id.* at PageID.849). The doctor concluded her ankylosing spondylitis was relatively mild and there were no findings with regard to heart failure due to vasovagal syncope. (*Id.*).

An April 2022 x-ray of Plaintiff's spine showed mild scoliosis, but no other findings, including no evidence of spondylolysis. (*Id.* at PageID.1160). An October

2022 MRI of the pelvis showed "[n]o acute findings in the sacrum or sacroiliac joints. The sacroiliac joints are unremarkable" and an "[u]nremarkable MRI of the pelvis. No evidence to suggest sacroiliitis or an inflammatory arthropathy in the pelvis." (*Id.* at PageID.1109–10).

An MRI of Plaintiff's thoracic spine in November 2022, showed minimal degenerative changes in her mid-lower thoracic spine. (*Id.* at PageID.1105). An MRI of Plaintiff's lumbar spine showed chronic degenerative disc disease without significant change since a 2014 car accident; no evidence of nerve root impingement; and unremarkable sacroiliac joints. (*Id.* at PageID.1159). Other facts will be discussed as necessary below.

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

(ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language

pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  *Id.* § 404.1520c(a).  "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."  *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.* § 404.1520c(c).

The first factor is "supportability."  For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative

medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

(i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews

evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide

"articulation requirements."   The ALJ will consider "source-level articulation."

Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).   The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

14

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)    Statements that [the claimant is] or [is] not disabled, blind, able

15

to work, or able to perform regular or continuing work;

(ii)     Statements about whether or not [the claimant has] a severe impairment(s);

(iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)     Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)  Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its]

16

determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological

17

tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be

accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

  (i)   [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

20

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

## G.   Argument and Analysis

As stated above, Plaintiff raises two issues on appeal.  First, she argues the ALJ erred by creating an internally inconsistent RFC with the imposed sit/stand option.  Second, she argues the ALJ erred by evaluating her subjective testimony using an improper legal standard.  Each issue will be considered in turn below.

### 1.   Internal Inconsistency

Plaintiff argues the ALJ erred when he made an inconsistent finding that she could perform a full range of sedentary work "but that she would have to be allowed to sit for 30 minutes after standing for 30 minutes and to stand for 30 minutes after sitting for 30 minutes."  (ECF No. 12, PageID.1644).  She argues this is internally and logically inconsistent because she would only be able to sit for four hours a day if she follows the instructions, and regulations and policies define sedentary work as the ability to sit for two-thirds (or six hours) in an eight-hour workday.  (*Id.*).  Given her restriction, she argues the vocational expert did not explain how she could still

accomplish the sedentary jobs relied upon in step five. (*Id.* at PageID.1646).

However, Plaintiff selectively reads the ALJ's decision to argue it was internally inconsistent. First, the decision does not support that the ALJ recommended a *full* range of sedentary work, which might be inconsistent with an option to sit or stand for four hours a day. *Accord Wages v. Sec'y of Health and Hum. Servs.*, 755 F.2d 495 (6th Cir. 1985). Instead, the ALJ specifically noted that Plaintiff's "limitations are adequately accommodated by a restriction to *less* than a full range of sedentary exertion." (ECF No. 7-1, PageID.54 (emphasis added)). Additionally, the RFC itself notes Plaintiff has the ability "to perform sedentary work . . . *except* that," among other limitations, she must have a sit/stand option. (*Id.* at PageID.53 (emphasis added)). The ALJ did not recommend a full range of sedentary work.

As Plaintiff's own briefing notes, "[a]n RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare." SSR 96-9P, 1996 WL 374185, at *1 (July 2, 1996). Nevertheless:

> When there is a reduction in an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administratively noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work: the occupational base will be "eroded" by the additional limitations or restrictions. However, *the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability*. There may be a number of occupations from the approximately 200

22

occupations administratively noticed, and jobs that exist in significant numbers, that an individual *may still be able to perform even with a sedentary occupational base that has been eroded*.

*Id.* at *4 (emphasis added). Additionally, SSR 96-9P explicitly recognizes that an RFC may need to accommodate an individual who must alternate between sitting and standing throughout the day. *Id.* at *6–*7.

Plaintiff's reliance on *Wages* is similarly unavailing. In *Wages*, medical evidence established that the plaintiff must be allowed to alternate between sitting and standing. *Wages*, 755 F.2d at 499. Nevertheless, the ALJ relied on the grid to conclude she could perform the full range of sedentary work. *Id.* The Sixth Circuit held this was error pursuant to the definition of sedentary work. In doing so, the court cited to SSR 83-12, which states

> [t]here are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferr[i]ng work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. *In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base*.

*Id.* at 498 (emphasis changed) (quoting SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983)). The Sixth Circuit has since explained that *Wages* was not meant to establish a bright-line rule and has distinguished cases in which an ALJ relied on the testimony

23

of a vocational expert instead of application of the grid to identify jobs a claimant can still perform despite their limitations. *See Bradley v. Sec'y of Health and Hum. Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988); *McCormick v. Sec'y of Health and Hum. Servs.*, 861 F.2d 998, 1002 (6th Cir. 1988).

Like in *McCormick*, the ALJ here relied upon the testimony of a vocational expert who was questioned on a hypothetical person with or without a sit/stand option.  (*See* ECF No. 7-1, PageID.115–123); *see also Arnold v. Comm'r of Soc. Sec.*, No. 15-cv-14068, 2016 WL 8376403, at *14 (E.D. Mich. Dec. 6, 2016) (distinguishing *Wages* where an ALJ relied on the testimony of a vocational expert), *report and recommendation adopted*, 2017 WL 767795 (E.D. Mich. Feb. 28, 2017).

The ALJ first asked the vocational expert a hypothetical which included a light exertional level without a sit/stand option.  (*Id.* at PageID.118).  The expert testified the hypothetical person could perform some of Plaintiff's prior jobs in addition to other jobs in the national economy.  (*Id.* at PageID.119–20).  The ALJ then added additional limitations, including a sit/stand option, which he defined as follows:

> First, there must be work that can be done in either position.  Such at the change of positions, it does not cause the worker to go off-task. After standing for 30 minutes, [the worker] should have the option to sit for up to 30 minutes.  After sitting for 30 minutes, [they] should have the option to stand for up to 30 minutes.

(*Id.* at PageID.120).  The expert testified this hypothetical would eliminate all past

work but that two of the prior jobs he stated could still be performed and he replaced the third job with another that fit the hypothetical, indicating the job had a sit/stand option.  (*Id.* at PageID.120–21).

Finally, the ALJ asked the expert to use the same limitations but change the exertional level to sedentary "within those parameters."  (*Id.* at PageID.121).  The expert testified Plaintiff could perform jobs existing with substantial numbers in the national economy, including a document preparer, a printed circuit board inspector, and an information clerk.  (*Id.*).  Although Plaintiff is correct that the inability to sit for six hours would generally preclude the ability to perform all sedentary work as defined in the regulations, *accord Wages*, there is no error in using a vocational expert to find jobs Plaintiff could still perform within the eroded job base.  The facts here are inapplicable with *Wages* and the ALJ did not err in relying on the testimony of a vocational expert.

The ALJ then discussed that he had asked the expert a number of questions "assum[ing] a number of limitations not addressed in the DOT.  Not the least of which are . . . sit/stand type options" and asked what the expert relied upon in formulating his answer to those hypotheticals.  (*Id.* at PageID.122).  The expert testified "[i]n addition to referring to the DOT and its supplements, I also use my experience and education when testifying."  (*Id.*).

Plaintiff now argues the expert did not sufficiently explain how she could still

accomplish the sedentary jobs with the sit/stand option and argues that his generic answer about "experience and education" was insufficient testimony. (ECF No. 12, PageID.1646). But the expert's resume was in the record, he testified it sufficiently set forth his qualifications, and he further testified he was familiar with jobs that existed in the national economy. (ECF No. 7-1, PageID.116). Plaintiff's counsel had no objections to his qualifications. (*Id.*). Further, Plaintiff did not take the opportunity to question the expert on his testimony regarding the sit/stand option and how his experience and education led him to believe a person with Plaintiff's limitations could perform those jobs. (*Id.* at PageID.122–23).

Plaintiff has thus waived any argument that the expert was not qualified to testify regarding jobs that someone could perform with a sit/stand option. *Accord Munger v. Comm'r of Soc. Sec.*, No. 19-cv-12830, 2011 WL 1186494, at *4 n.5 (E.D. Mich. Mar. 30, 2021) ("[I]n 2020, the Sixth Circuit held that a plaintiff waives any argument about discrepancies between a VE's testimony and the DOT when Plaintiff's counsel does not cross-examine the VE at the ALJ hearing.") (citing *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 317–18 (6th Cir. 2020)); *see also Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 982 (6th Cir. 2011) ("[B]ut as the district court pointed out, plaintiff's counsel had the opportunity to cross-examine, but asked only one question and did not probe the deficiency now identified on appeal.").

2.     **Subjective Testimony**

Plaintiff's next argument is twofold: first, she argues the ALJ improperly required her to prove her symptoms remained at a constant level for twelve months; second, she argues the ALJ failed to adequately take into account her activities of daily living and other non-medical evidence when evaluating her testimony.

First, Plaintiff argues the ALJ has conflated the step two requirement that a claimant must have a severe impairment that lasts for 12 months for that impairment to be considered potentially disabling with the evaluation of a plaintiff's subjective testimony and symptoms. (ECF No. 12, PageID.1650). Plaintiff then partially block quotes a single paragraph from the ALJ's extensive analysis, which is fully recounted here:

> The claimant's symptoms [are] partially supported by evidence. Although the presence of pathology is objectively supported, the degree of impairment alleged (*i.e.*, total disability) is not supported for any durational period during the time at issue. The above assessed residual functional capacity is the most restrictive arguable from this record as present for a durational time during the relevant period. I note that there are no more restrictive residual functional capacity opinions in this record.

(ECF No. 7-1, PageID.66). Plaintiff's argument is focused on the ALJ's use of the words "durational period" and "durational time," arguing the ALJ's meaning was "quite clear" that he required her testimony to be supported "at a constant level for 12 months" and that the ALJ is instead supposed to evaluate her ability to work on a sustained basis and take into account the episodic nature of her impairments. (ECF

No. 12, PageID.1651).

Plaintiff's interpretation of the ALJ's meaning is not "quite clear," as she argues. To the contrary, taken on its own, the ALJ's meaning is quite muddled and could be interpreted several different ways. However, when the ALJ's decision is read as a whole, it is clear the ALJ did not use the wrong legal standard in assessing Plaintiff's RFC.

The ALJ stated the correct legal standard for determining an individual's RFC: "An individual's [RFC] is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." (ECF No 7-1, PageID.49). In his analysis, the ALJ repeated:

> It is reasonable to find the claimant has limitations in functioning resulting from her impairments, but for the reasons explained herein, such limitations are adequately accommodated by a restriction to less than a full range of sedentary exertion.

> The [RFC] is to be a reflection of the most that can be sustained on a regular and continuous basis, and for the reasons discussed below, the evidence of record as a whole does not support the extent of functional limitation subjectively alleged.

(*Id.* at PageID.54).

Plaintiff acknowledges that the ALJ "quite thoroughly summarized the Plaintiff's testimony and written statements concerning her daily activities" and "then summarized the medical evidence in fairly great detail." (ECF No. 12, PageID.1652). After doing so, the ALJ found her symptoms were partially

28

supported by the evidence but that total disability was not supported even though the ALJ had assessed the most restrictive RFC contained in the record, and he found that "claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (ECF No. 7-1, PageID.66–67). Plaintiff has not shown the ALJ imposed an improper legal standard when the decision is read as a whole. *Accord Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (viewing ALJ's decision as a whole). Nor does she challenge the ALJ's discussion or analysis of the objective medical evidence.

Plaintiff next argues the ALJ failed to evaluate her activities of daily living and other non-medical evidence. (ECF No. 12, PageID.1652). To the contrary— and acknowledged by Plaintiff's very next sentence—the ALJ "quite thoroughly summarized" her testimony and written statements concerning her daily activities:

> For instance, the claimant testified she has a driver's license and drives her daughter to school four (4) days a week. As far as her education, she testified she graduated from high school and is able to read and write. She testified she is able to dress herself and bathe herself "the majority of the time." She testified that she is able to open and close doors on her own. She testified that she does do dishes, can run a vacuum, and does do laundry. She testified that her hobbies include crocheting, reading, and Diamond Dots. This information is consistent with the record.
>
> In a function report completed by the claimant on July 25, 2022, the claimant alleged that she is not able to care for herself or her children by herself. She further alleged that she needs help with even simple tasks like dishes, laundry, and dressing herself. She also alleged her

memory issues have cause[d] her to forget important things, such as taking her medications, giving her kids their medication, remembering to eat something, and remembering where things are. In addition, she reported difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, concentrating, understanding and following instructions, using her hands, getting along with others, and sleep disturbance. The claimant indicated that her typical day involves letting her dogs outside and getting them fresh water; however, she indicated that her husband provides all other care for their cats and dogs. In terms of her own personal care, she also reported problems with bathing herself, caring for her hair, shaving, and feeding herself (has no appetite). She reported that she also needs to be reminded to take her medications at night. As it relates to her activities of daily living, she indicated that she does not prepare her own meals. She indicated that she can do dishes and can sit and fold some laundry, but her husband has to carry it up and down the stairs. She indicated if she does anything besides dishes or laundry, she cannot get out of bed for two (2) days, and her parents have to take and watch her children. With regard to getting around, she reported she can ride in a car and drive. She further reported that she is able to go out alone, but only goes outside when she absolutely has to, and most days she just sits in her chair while her kids play. She also reported she does not do any shopping. She did not report any issues relating to her ability to handle money/finances. Regarding hobbies, she indicated she likes to read, but looses [sic] concentration. She indicated that she like[s] to crochet, but her neck hurts after ten minutes (Exhibit 6E).

At the hearing, the claimant reported that she is 5'7" tall and weighs 210 pounds. She testified she is right handed. She testified that her marital status is married. She testified that she has two (2) children, ages three (3) and one (1). She testified that her only source of income is her husband's employment. She testified she does not receive any form of public assistance. Again, she testified she does have a driver's license and drives four (4) days a week on average. She testified she does not hold a license or certification in any occupation. She testified she has not served in the Armed Forces. She testified that she has not performed any work since her alleged onset date. She testified that she stopped working at her last job because she was six (6) months pregnant and started having panic attacks. The claimant testified the major thing preventing her from working right now is severe back pain caused by

30

two (2) herniated disc. She testified that she tried an injection just a week before the hearing, which did not work. She testified that she has tried "all sorts of things" for her back. She testified that she has difficulty sleeping due to the pain in her back, and has to change positions frequently. She testified that she can only sleep for about two (2) hours at a time. She testified that the pain radiates down into her hips, which is worse on the right side. She testified that the injection "didn't do anything." She testified that she also had physical therapy, which was not helpful. She testified she does not use any splints or braces and was told that she should not use them when she specifically inquired about it. She testified that they want her to move, rather than be immobilized. She testified that she has also tried a TENS unit, which did not help, and only caused her back to spasm. She testified she does have a walking stick that she uses "every now and again." She testified it was not prescribed and she tries not to use it, but sometimes has to when her hip is hurting so bad. She testified that she also has right knee pain, and neck pain, which radiates into her right shoulder. She testified that she also gets headaches/migraines. She testified that she does not have any warning before the onset of her migraines. She testified that the frequency of the migraines is four (4) or five (5) times a month. She testified that they can happen at any time of the day and typically last anywhere from a couple hours to a couple days. She testified she does have prescription medication that she takes, but it is not very effective. She testified that she also takes Tylenol. She testified that other means she uses to reduce her migraines are a cold cloth and laying in a dark quite room. She testified her back and hip pain are exacerbated by activity, sitting too long, and driving. She testified that she has tried ice and heat. She testified that she has also tried opiates in the past. She testified that the pain is daily. She testified that her breathing is okay. As for her abilities and limitations, she testified that she can sit for ten to fifteen (10–15) minutes. She testified that she can stand about five (5) minutes. She testified that she can walk for only about three (3) minutes before having severe pain. She testified that some days she does have trouble using her hands because she has a benign tremor. Exertionally, she testified she is not supposed to carry more than a gallon of milk. With respect to her activities of daily living, she testified that she does not cook. She testified that she can run a vacuum, even though she is technically not supposed to use it. She testified she does not garden and does not cut the grass. She testified that she does "very little" shopping. She testified that she does not engage in any

31

social activities on a regular basis.

(ECF No. 7-1, PageID.54–56).

Under 42 U.S.C. § 423(d)(5)(B), an ALJ must consider a claimant's entire medical record before rendering a decision. *See also* 20 C.F.R. § 404.1520(a)(3). This does not mean, however, that an ALJ's written decision must mention every piece of evidence in the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Indeed, an ALJ need not discuss evidence that clearly would not impact his or her decision. *See id.*; *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990). Rather, an ALJ need only articulate his or her reasoning well enough to allow a reviewing court to understand the basis for the decision. *See Bailey v. Comm'r of Soc. Sec.*, No. 98-cv-3061, 1999 WL 96920, at *3–*4 (6th Cir. 1999).

Although Plaintiff argues the ALJ found all of her testimony "consistent with the record," (ECF No. 12, PageID.1652), this statement was made only after the first paragraph quoted above. To the contrary, as discussed above, the ALJ found other parts of her testimony and statements "not entirely consistent with the medical evidence and other evidence in the record." (ECF No. 7-1, PageID.67). Some of the ALJ's analysis is clear within the quoted text above. For example, after discussing some of Plaintiff's reported activities of daily living, the ALJ stated the evidence was consistent with the record. The ALJ then thoroughly summarized other subjective limitations Plaintiff alleged—which amounted to "total disability"

32

(*Id.* at PageID.67)—and found that this degree of impairment was not fully supported by the record. To be sure, Plaintiff has severe medical issues amounting to a high number of exertional and non-exertional limitations as found by the ALJ's RFC. But this is not a case where the ALJ wholly failed to support his reasoning, leaving the Court to guess at the basis for his decision—quite the opposite. To require the ALJ to discuss every piece of evidence in this 1,500 page record (as Plaintiff seems to suggest is necessary) is onerous and not required by the regulations.

It is clear the ALJ adequately discussed and analyzed the entire record even though he did not mention every piece of evidence in his written decision. Moreover, Plaintiff has not pointed to *substantial* record evidence the ALJ ignored. *E.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725–26 (6th Cir. 2014) (ignoring substantial evidence violated ALJ's duty to consider all symptoms). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286.

## H. Conclusion

The ALJ properly weighed the evidence and supported the findings with substantial evidence. While the evidence could support a different conclusion, it is not the Court's job to re-weigh the evidence in the first instance. Therefore,

Plaintiff's motion for summary judgment should be **DENIED** (ECF No. 12) and Defendant's motion for summary judgment should be **GRANTED** (ECF No. 19). The ALJ's decision should be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains.

34

Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 22, 2026

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

35